| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------x<br>In re:<br><br>DYNAMIC-283 WEST BROADWAY LLC,<br><br>Debtor.<br>------------------------------------------------------x | Return Date:<br>March 22, 2010 @ 10:00 A.M.<br><br>Chapter 11<br><br>Case No. 10-10153 (BRL) |

## DEBTOR'S OPPOSITION TO MOTION OF INLAND MORTGAGE CAPITAL CORPORATION FOR ABSTENTION, DISMISSAL OF THE CHAPTER 11 CASE, VACATUR OF THE AUTOMATIC STAY OR APPOINTMENT OF AN OPERATING TRUSTEE

Dynamic-283 West Broadway LLC (the "Debtor") as and for its opposition to the motion of Inland Mortgage Capital Corporation ("Inland") seeking abstention, dismissal of the Chapter 11 case, vacatur of the automatic stay or appointment of an operating trustee, represents and shows this Court as follows:

### THE TRUE CONTEXT FOR THE CHAPTER 11 CASE

While launching a multi-prong attack, Inland's perceived frustration with the Chapter 11 case, in reality, is a function of its own doing, as the Debtor was content to litigate in the state court so long as Inland honored the parties' working agreement that disposition of the case would not be unnecessarily complicated by the involvement of a receiver.

Early on in the foreclosure action, Inland attempted to exert hegemony over the Debtor's condominium development property at 283 West Broadway, New York, New York (the "Property") and moved last year for the appointment of a receiver in the state court foreclosure action. In the end, Inland voluntarily withdrew this motion after the Debtor countered any suggestion that the Property was in disrepair or need of preservation. Instead, the parties acknowledged that in lieu of a receiver, the Debtor

would provide Inland with access to the Property for the purpose of making regular inspections. A stipulation was duly entered to this effect, a copy of which is annexed hereto as Exhibit "A".

While the stipulation is without prejudice to future applications, the clear understanding was that the prospect of a receivership would not be used as a litigation tool. From there, the parties then proceeded to litigate the merits of their respective various claims and counterclaims, primarily in the context of a highly disputed motion for summary judgment filed by Inland on August 6, 2009. This motion was fully briefed as of October 13, 2009 and remains under submission before the Hon. Marylin G. Diamond in the Supreme Court, New York County. Perhaps growing impatient with disposition of the matter, late last year Inland indicated it would again seek the appointment of a receiver. The Debtor reiterated that a receivership was unnecessary and that the Property remained in satisfactory condition. Moreover, the Debtor offered Inland the opportunity to correct any perceived deficiencies under a protective advance, as necessary. But Inland would have none of it and insisted on proceeding again with a receiver.

Sensing that the renewed prospect of a receiver was being used as a tool to short-circuit the pending litigation, the Debtor opted for Chapter 11 relief so as to at least preserve the status quo. Thus, the bankruptcy filing, which Inland wrongly suggests was commenced in bad faith, was effectively forced upon the Debtor by Inland's litigation tactics designed to undermine legitimate and important defenses and counterclaims. Moreover, the alternate forms of relief sought by Inland all have the same practical effect of divesting the Debtor of control and promoting Inland's agenda and efforts to sell its mortgage debt in the distressed loan market.

The nature of the Debtor's defenses and counterclaims were amplified in the Affidavit in Opposition submitted on behalf of the Debtor in opposition to Inland's motion for summary judgment. A copy of this affidavit is annexed hereto as <u>Exhibit</u> "B" and incorporated by reference.

This affidavit highlights Inland's history of unjustified delays in the financing and processing of construction requisitions, which put the project behind schedule from which it could not recover. With improving financial conditions, over the last year, the project has drawn renewed interest, and the Debtor remains hopeful that if it obtains relief on its counterclaims, it can successfully emerge from Chapter 11.

Operationally, Inland's allegations that the Property is deteriorating are incorrect and exaggerated. Specifically, Inland's consultant (EBI Consulting) conspicuously does not specify in its latest November 2009 report any additional testing that was performed to identify new sources of water infiltration. In actuality, EBI Consulting appears to rely upon long-standing pictures of damaged sheetrock that were the remnants of the earlier water infiltration, long since remedied. It cannot be summarily concluded that the Property is deteriorating on the strength of the pictures of staining. This is only evidence of cosmetic damage, and does not establish structural damages. In sum, the Debtor remains committed to maintaining the Property. The contrived notion that the "sky is falling" on Inland should not be used to deflect attention from its own breaches that triggered the ultimate undoing of the project.

At this juncture, the Chapter 11 proceedings remain a viable forum to address all of these matters, particularly since the claims of a number of contractors and other vendors hang in the balance. Contrary to many real estate bankruptcy cases, this is

not a simple two-party dispute and an Official Committee of Unsecured Creditors (the "Committee") has been organized by the Office of the United States Trustee. Hopefully, the Committee will weigh-in against Inland, but even if they are not yet fully organized and developed, Inland's motion should be denied to provide the Debtor with at least a reasonable and fair opportunity to achieve a restructuring and reorganization.

## BACKGROUND FACTS

Certain background facts should be reviewed so the motion can be put in its proper temporal context. The Property consists of a five story commercial building that was acquired in 2005 with a view of developing it into five residential luxury condominium apartments, together with a ground floor commercial space, to be known as "Tribeca Five."

At the time, the project was relatively modest in scope and Inland represented that it could work quickly to deal with local contractors and agreed to provide both acquisition and construction financing in the aggregate sum of $11,100,000. Regrettably, Inland micromanaged the project to the point of paralysis, and benefited from the unnecessary delay by accruals of additional interest and other costs. Indeed, most of the funding provided under the loan amendments was devoted to paying Inland interest.

As a result, the project fell badly behind schedule and succumbed to the collapse of credit and financial markets after completion of construction was delayed for nearly two years time.

Currently, the Property remains unoccupied and is approximately 95% complete, needing only approximately $600,000 to be in a position to obtain a certificate of occupancy to deliver units for sale. If completed, sales and leasing could potentially generate approximately $10 million in an improving market, more than enough to address

the claims of Inland after necessary adjustment and reduction for the Debtor's counterclaims.

## CURRENT STATUS OF THE PROPERTY

The condition of the Property has been debated since commencement of the foreclosure action. Last year, the Debtor submitted detailed opposition demonstrating that repairs were made to prevent water infiltration. The specific remediations are set forth in the affidavit of Brad Zackson, dated May 29, 2009, a copy of which is annexed hereto as Exhibit "C".

Since that time, the Debtor regularly visits the Property and makes repairs as necessary. As we stand today, the Property is not in need of third-party oversight and remains in reasonable condition.

Most of Inland's discussion concerning the condition of the Property relates to inspections conducted months ago in the context of the prior receivership motion. Inland does not break new ground, even in its November 20, 2009 report, since the pictures contained therein reflect old and outdated conditions.

Obviously, as the fee owner of the Property, with a strong desire to complete construction and ultimately sell the units, the Debtor is equally fearful of water infiltration. However, contrary to Inland's claims, the Property does not have current leaks. All ponding on the roof, which is typical for flat roofed buildings, has drained away based on existing systems. Attached hereto as Exhibit "D" are current photographs confirming the absence of any current standing water on the roof.

Moreover, Inland has an open invitation to undertake remediation of legitimate concerns. Indeed, the Debtor has never stood in Inland's way under the state

court stipulation. However, the Debtor disputes any suggestion of dire conditions at the Property, which are contradicted by the current photographs showing no structural damages whatsoever.

Even the November 20, 2009 report only noted some evidence of undefined "standing water" on a part of the penthouse roof bulkhead, without any specificity as to the precise quantity. No such water currently exists because the Debtor, without prodding, installed an additional rooftop drain with a downspout to allow any residual water to drain away. The balance of the report is even more nebulous, as the consultant merely observed "moisture" in various areas without any detailed explanation of the consequences. Obviously, incidents of moisture increase during the fall and winter months, without endangering the structural integrity of the Property.

Finally, the contention that the Debtor has left the Property unlocked and unguarded is also a complete misstatement and exaggeration. Inland levels this charge because of the alleged absence of a "dead-bolt" lock to a single outside door for the penthouse. A "dead-bolt" exists as confirmed by the attached photograph, but even if it did not, it is hardly an indictment on the security of the entire building since the front doors are locked at all times.

## ARGUMENT

### A. This Case Should Not be Dismissed under Section 305

Inland's fusillade involves a number of dismissal related theories. Inland first seeks to dismiss the case under Section 305(a) of the Bankruptcy Code, which provides in relevant part that:

> The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension . . . .

"The test under § 305(a)(1) . . . is whether 'both the 'creditors and the debtor' would be 'better served' by a dismissal.' Eastman v. Eastman (In re Eastman), 188 B.R. 621, 624-25 (9th Cir. BAP 1995)." In re Aerovias Nacionales De Colombia S.A. Avianca, 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003). Moreover, as the Court noted in Aerovias, the "Courts have stressed that dismissal or suspension under § 305(a)(1) is a form of 'extraordinary relief.'" Id. at 9.

In its memorandum, Inland cites to the factors enumerated in In re 801 South Wells Street, LP, 192 B.R. 718, 723 (Bankr. N.D.Ill 1996), adopted by the Hon. Tina L. Brozman in In re RCM Global Long Term Cap Appreciation Fund, 200 B.R. 514, 524 (Bankr. S.D.N.Y. 1996), and reaffirmed as recently as 2008 in In re Monitor Single Lift I, Ltd., 381 B.R. 455 (Bankr. S.D.N.Y. 2008), as tools to be used in analyzing dismissal under Section 305(a). These factors include:

> (1) economy and efficiency of administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving an equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far in those proceedings that it would be costly and time consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought.

The Debtor respectfully submits that the fair application of these factors weighs against dismissal. To begin with, the Bankruptcy Court now provides the most expeditious forum to deal with the parties' competing claims and even offers Inland a panoply of rights that are not readily available in the state court.

To be sure, the defenses and counterclaims raised by the Debtor need to be resolved; and there is a certain visceral reaction that perhaps the matter should return to state court. However, the Bankruptcy Court is equally adept at dealing with all of the issues, and can do so without leaving the Debtor exposed to the vagaries of receivership through removal pursuant to Bankruptcy Rule 9027. Furthermore, the duties and responsibilities required of the Debtor under the Bankruptcy Code offer Inland the opportunity for oversight.

The most important consideration, however, is that the test under Section 305(a)(1) is not what is in the best interest of the party seeking dismissal, but what is in the best interest of both the Debtor and all of its creditors. In a case where a debtor was similarly facing foreclosure in the event of a dismissal of the Chapter 11 filing, the Bankruptcy Court for the Northern District of Illinois rejected a Section 305(a)(1) dismissal motion, noting that dismissal would be in the best interest of secured mortgage holder, but would also be

> contrary to the interest of the Debtor and not in the interest of the other creditors of the Debtor (however many and whoever they may be). The Debtor would lose its interest in the property through foreclosure and any right or ability to protect that interest under the bankruptcy laws would also be lost. Other than the taxing authority, which presumably has a lien prior to [the mortgagee's], other creditors of the Debtor would have no remedy in the foreclosure proceedings.

8

In re Foundry of Barrington Partnership, 129 B.R. 550 (Bankr. N.D.Ill. 1991).

### B. This Case Should Not be Dismissed under Section 1112(b)

Inland also seeks dismissal under Section 1112(b), alleging that the petition was filed in bad faith. Inland's motion is predicated upon the misconception that the Debtor has no reasonable expectation of confirming a plan because of the large secured debt owed to Inland. It then argues that if no plan can be confirmed, the petition was *ipso facto* filed in bad faith, and is merely a litigation tactic.

Inland's legal analysis of bad faith oversimplifies the issues because the correct and proper amount of Inland's mortgage claim remains very much in dispute. If the Debtor is even partly successful on its counterclaims, then Inland's claims in bankruptcy are far more manageable and reorganization is clearly possible.

To be sure, the Debtor recognizes a good faith requirement even though, as a matter of pure textual matter, the Bankruptcy Code does not address good faith in the context of the filing of a petition, but only requires that a plan of reorganization be "proposed in good faith." 11 U.S.C. § 1129(a)(3). Nevertheless, as explained more than twenty years ago in In re HBA East, Inc., 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988), a bad faith filing has been invoked as one of the non-enumerated grounds constituting "cause for dismissal" under 11 U.S.C. § 1112(b) and legions of cases have so held.

The actual principles and parameters of bad faith have been developed by the Second Circuit in In re Cohoes Industrial Terminal Inc., 931 F.2d 222 (2d Cir. 1991) and In re C-TC 9th Avenue Partnership, 113 F.3d 1304 (2d Cir. 1997). The prevailing test - which combines an analysis of objective futility involving persons or entities facing financial difficulty and subjective bad faith – turns upon whether the debtor intends to

reorganize and whether a reasonable possibility exists that the debtor will emerge from bankruptcy. See, In re 69 West 127th Street LLC, 285 BR.838, 846 (Bankr. S.D.N.Y. 2002) [Synthesizing Cohoes Indust. Terminal, supra, (Bad faith exists, if it is clear on the filing date, there is no reasonable likelihood that the debtor intended to reorganize and the debtor has no probability to emerge from bankruptcy) and C-TC 9th Avenue, supra, (Chapter 11 petition may be "frivolous" if the "debtor has no reasonable probability of emerging from the bankruptcy proceedings and no realistic chance of reorganizing")]. See In re RCM Global Long Term Corp. Appreciation Fund, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) ["... a petition will be dismissed if both objective futility of the reorganization process and subjective bad faith in filing the petition are found . . . But a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the strongest evidentiary showing."] Accord: In re Carolin, 886 F.2d 693 (4th Cir. 1989); In re Sylmar Plaza, L.P., 314 F.3d 1070 (9th Cir. 2002).

Under any reasonable interpretation, the Debtor easily passes the test of good faith. Its intentions to reorganize are sincere. Insofar as the Debtor's ability to reorganize, the Debtor need only show a reasonable possibility of reorganization, not absolute assurances.

Furthermore, bad faith does not arise merely because the Debtor is a single real estate entity. See In re Balboa Street Beach Club, Inc., 319 B.R. 736, 742 (Bankr. S.D. Fla. 2005) ["a single asset real estate (sic) is not per se a bad faith filing, since Congress in the 1994 Amendments to the Bankruptcy Code implicitly allowed single asset real estate cases by assigning a definition to them under 11 U.S.C. § 101(5)(b)".].

10

Additionally, it is certainly not bad faith for the Debtor to take steps to preserve its most important asset. See, e.g. In re RBGSV Inv. Corp., 253 B.R. 352 (E.D.Pa. 2000) [Risk of forfeiture of debtor's lease constituted "a reasonable and rationale basis to conclude that there was no abuse of discretion in failing to dismiss for bad faith," even though bankruptcy arguably gave debtor an advantage in other litigation.].

Indeed, Chapter 11 is a permissible and useful option for companies so long as the filing serves a bankruptcy purpose. The Supreme Court has defined such purposes to include, inter alia, "deriving as much value as possible from the debtor's estate". Toibb v. Radloff, 501 U.S. 157, 161-164 (1991).

Nor is it bad faith that the Debtor may sell the Property, after completing the construction, to fund a liquidating plan. Thus, in In re G.S. Distribution Inc., 331 B.R. 552 (Bankr. S.D.N.Y. 2005), the court found that it is proper to attempt to utilize Chapter 11 to liquidate property or preserve assets. In denying a motion to dismiss for bad faith, the court aptly noted that "courts should dismiss on bad faith grounds sparingly, 'with great caution . . .". Id. at 566, quoting Carolin Corp. v. Miller, supra. Moreover, the court also made clear that a Chapter 11 debtor "had the right to file a petition in an effort to save its business and protect any rights its general creditors might have had . . . and the Debtor cannot be faulted for asserting the rights of its creditors to the full extent of the law." Ibid.

Further, the Debtor has not commenced the instant proceeding merely as a litigation tactic. Inland cites to In re Bridge to Life, Inc., 2006 WL 1329778 (E.D.N.Y. 2006) as standing for the proposition that the petition should be dismissed if it was commenced solely as a litigation tactic. However, in that case, the debtor was a serial

filer in violation of a prior dismissal "with prejudice," involved in what was essentially a two party dispute. Here, the Debtor has a number of unsecured creditors owed some $300,000 in the aggregate, who will be harmed, not benefited, by dismissal in favor of Inland.

In this case, the Debtor has been victimized by Inland's own litigation tactics in the form of the renewed demand for a receiver. Faced with this prospect, the Debtor's use of Chapter 11 is consistent with a central precept of bankruptcy, namely – the protection, maximization and return of value on the Debtor's Property for the benefit of all creditors and equity holders. It is not bad faith for the Debtor to seek Chapter 11 relief to invoke certain statutory rights available under the Bankruptcy Code, including Section 362.

It has been consistently recognized as a "truism" – even by a court which has dismissed a petition – that "it is not bad faith to seek to avail oneself of a particular protection in the Bankruptcy Code – Congress enacted such protections with the expectation that they would be used." In re Integrated Telecom Express, Inc., 384 F.3d 108, 127 (3rd Cir. 2004). Or to put it in a more practical manner of speaking: "It is not bad faith to seek to gain an advantage from declaring bankruptcy – why else would one declare it?" In re James Wilson Assoc., 965 F.2d 160, 170 (7th Cir. 1992).

Very often, creditors are frustrated by bankruptcy, but this, too, is not a proper ground for dismissal or indicia of bad faith. Cohoes Industrial Terminal Inc., supra, at 228 ["Filing a bankruptcy petition with the intent to frustrate creditors does not by itself establish an absence of intent to seek rehabilitation"]. Keeping the primary focus on the permissible uses of the Bankruptcy Code is important because, taken out of

context, the exercise of certain rights under the Code that are perfectly legitimate may appear hurtful, even malicious, yet the exercise of a statutory right or remedy should rarely, if ever, be said to be in bad faith. As stated by Judge Fox in In re Clinton Centrifuge, Inc., 72 B.R. 900, 905 (Bankr. E.D.Pa. 1987):

> In engrafting the good faith requirement into the Code, courts must be careful not to upset the delicate balance of interests fashioned by Congress under chapter 11. Moreover, to the extent that the concept of good faith exists independent of other Code provisions (such as adequate protection), courts must be vigilant to apply this concept in ways consistent with the legislative policy decisions embodied in these other [Code] enactments. Thus, in evaluating a debtor's good faith, the court's only inquiry is to determine whether the debtor seeks to abuse the bankruptcy law by employing it for a purpose for which it was not intended. When a debtor is motivated by plausible legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case.

68 West 127 Street LLC, supra, at 844.

In sum, the Debtor is using Chapter 11 for its intended purposes -- to restructure its debts and emerge from Chapter 11 after the issues with Inland are resolved.

### C. There Is No Basis To Lift The Automatic Stay Under 11 U.S.C. § 362(d)

Inland's request to lift the automatic stay is a rush to judgment and raises issues of fact and law, particularly as to whether the Property is necessary to an effective reorganization and can be adequately protected during the pendency of the case.

Under familiar principles, 11 U.S.C. § 362(d)(2) permits the stay to be modified with respect to specific property if "(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization."

Interestingly, Inland does not offer any evidence whatsoever to support either its alleged valuation of the Property at $5,000,000, or to establish that its disputed claim is worth more than the Property. It simply cites to the Debtor's schedules. Not only does this overlook the possibility of raising money to complete the construction so that potential sales of the units can be pursued in the upcoming months as the real estate market recovers, but it completely ignores the fact that there is pending litigation in which the Debtor actively disputes the debt asserted by Inland.

Importantly, even as the parties debate equity, there can be no disputing that the Property is essential to an effective reorganization. It constitutes the Debtor's sole asset. In this regard, the Debtor understands the Supreme Court admonition that an effective reorganization typically means that "there must be a reasonable possibility of a successful reorganization within a reasonable time. United Savings Association v. Timbers of Inwood Forest Associates, Ltd., 484 U.S.365, 375-76, 180 S.Ct. 626 (1987). However, the Supreme Court also noted that when the motion is made in the early stages of the case, prior to the termination of exclusivity, the courts "demand less detailed showings" of reorganization prospects. Id. at 376.

Here, Inland argues that the Debtor cannot meet its burden that the Property is necessary to an effective reorganization because the Debtor has no equity in the Property. This is non-sequitur. Even if it were found that there is no equity in the Property, the Debtor is still actively litigating both is defenses to the foreclosure action and its counterclaims. In the event it is successful in this litigation, the Debtor will be capable of negotiating a plan with other creditors and, perhaps, cramming down or stripping Inland's lien under § 506(b).

This case thus differs from In re 160 Bleecker St. Assocs., 156 B.R. 405 (S.D.N.Y. 1993), cited by Inland. In that case, the Debtor's cooperative apartment project had been languishing for ten years, including more than two years in Chapter 11, and the Debtor had failed to confirm two separate plans. Further, the Debtor's own expert testified that the proposed sale of apartments, from which a plan would be funded, would take between 8-10 years to complete.

The District Court found that there was no reasonable prospect for any reorganization. Here, the Chapter 11 case has just commenced, and the Debtor has substantial affirmative defenses and counterclaims to Inland's claims, plus the prospect of completing the condominium development and selling out the units to fund a plan.

In short, there is a myriad of possibilities short of foreclosure - it is far too early to make a finding that this Debtor will never be able to confirm a plan.

### D. There is no basis for the appointment of a Trustee

Section 1104(a)(1) permits the appointment of an operating trustee for cause, including "fraud, dishonesty, incompetence or gross mismanagement." No such allegations are made by Inland.

Inland also cites to Section 1104(a)(2), and the case law developed thereunder, which permits the appointment of an operating trustee when doing so would be in the "interest of the creditors . . . and other interests of the estate."

The sole basis upon which Inland seeks the appointment of an operating trustee is that the Property is purportedly depreciating due to an alleged lack of diligence on the part of the debtor. This is absolutely untrue. In fact, numerous steps have been

taken to protect the Property, and those safeguards are and will remain in place. Clearly, there is no basis for the mandatory appointment of a trustee under Section 1104(a)(1).

Moreover, given the steps taken by the Debtor to protect its investment in the Property; the various protections for creditors specifically provided for by the Bankruptcy Code, including the duties of a debtor specified in Section 1106, and, most importantly, the fact that the Property is not currently generating any revenues for a trustee to administer, there is no simply no reason to inflict another layer of administrative debt on this proceeding.

This Court should reject the request for an operating trustee as a mere end run in Inland's continuing bad faith efforts to wrest control of the Property away from the Debtor while the bankruptcy is being pursued.

WHEREFORE, the Debtor respectfully requests the entry of an Order consistent with the foregoing, and granting such other relief as may be proper.

Dated: New York, New York
March 10, 2010

                                          GOLDBERG WEPRIN
                                          FINKEL GOLDSTEIN LLP
                                          Attorneys for the Debtor
                                          1501 Broadway - 22nd Floor
                                          New York, New York 10036
                                          (212) 221-5700

                                By: _____
                                          Kevin J. Nash, Esq.
                                          A Member of the Firm